IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE VALLEY COMMUNITY
PRESERVATION COMMISSION,
a New Mexico nonprofit corporation,

and

GERALD JOE FORD, ROYCE GRIGGS,
and TROY OMNESS,

       Plaintiffs,

v.                                    CIV. No. 02-1306LH/WWD

NORMAN MINETA, Secretary
U.S. Department of Transportation,
MARY PETERS, Administrator
Federal Highway Administration,

and

RUEBEN THOMAS,  Division
Administrator Federal Highway
Administration, New Mexico Division,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiffs' motion for preliminary injunction

(Docket No. 6).  Plaintiffs Valley Community Preservation Commission, Gerald Joe Ford, Royce Griggs and Troy Omness ("Plaintiffs") filed suit, seeking to halt construction of a 37.5 mile federal-aid highway project to reconstruct U.S. 70 into a continuous four-lane highway through the Hondo River Valley in Lincoln County, New Mexico.  The stretch of road at issue in this litigation is that between Ruidoso Downs and Riverside ("the Project").  This road is presently a rural two-lane highway.  Plaintiffs contend that injunctive relief is needed to prevent irreparable injury to natural and historic resources, which are directly threatened as a result of imminent construction activities, because Defendants have failed to comply with the requirements of Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C).  Plaintiffs seek judicial review of these decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  Judicial review under the APA of informal agency adjudications is normally confined to the administrative record.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

The Court, having considered the original briefs, the supplemental briefs and arguments of counsel at a hearing on November 20, 2002, concludes that Plaintiffs' motion for preliminary injunction (Docket No. 6) is not well-taken and will be **denied**.

## I.  Procedural Background

This matter was originally filed in the District Court for the District of Columbia on July 31, 2002.  On September 26, 2002, that Court (the Honorable Reggie B. Walton) entered a Memorandum Opinion and Order, 2002 WL 31163094 (D.D.C. Sept. 26, 2002),  transferring this case to the District of New Mexico, denying Plaintiffs' motion for temporary restraining order, and

deferring ruling on Plaintiffs' motion for preliminary injunction to this Court.  Having assessed the arguments advanced by both parties in briefing and a hearing, Judge Walton found that Plaintiffs were not likely to succeed on the merits of any of their claims. Weighing the interests of environmental and cultural resource protection against the interest of protecting human lives, that Court further found that Plaintiffs had failed to establish that the public interest favored the grant of emergency injunctive relief.

This matter was transferred and actually docketed in this Court on October 15, 2002.  The Court requested supplemental briefs and scheduled a hearing on this matter for November 13, 2002. At the behest of both parties, the hearing was postponed until November 20, 2002.[1]

At the November 20 hearing, without contradiction from defense counsel, Plaintiffs' Counsel, Ms. Ferster, clarified that only two issues have been raised in the context of this injunctive relief proceeding:  a claim raised under § 4(f) of the Department of Transportation Act and a claim under the National Environmental Protection Act[2],  involving a potential conflict of interest of the contractor, Parsons Brinckerhoff.  The Court will accordingly limit its analysis to these two issues.

---

[1] At the November 20 hearing, because the issues before the Court were purely legal, the Court discussed with the parties its intention to take no evidence and the possibility of consolidating the hearing with the trial on the merits, thereby immediately reaching the merits of the case, as allowed by FED.R.CIV.P. 65(a)(2).  Plaintiffs' counsel objected to this approach, indicating that certain claims and issues were asserted in the Complaint but have not been advanced as part of the preliminary injunction proceedings.  She specifically mentioned the issue of alternatives, the issue of adequacy of the consideration of alternatives during the NEPA process, and the issue of constructive use under § 4(f).  Based upon the reasons stated by Plaintiffs' counsel, the Court will not consolidate this matter.

[2] Although Plaintiffs did not include a claim alleging violation of the National Historic Preservation Act, Judge Walton engaged in a lengthy analysis of FHWA's compliance with regulations promulgated under Section 106 of the National Historic Preservation Act.  This has lead to some confusion as to the relevant focus in this case.

## II.  Legal Standards

### A.  Injunctive Relief

New Mexico, like the District of Columbia, employs the four-part standard for injunctive relief.  The variations in this standard, as employed by these two districts, are not material  The substantive requirements for a preliminary injunction and temporary restraining order are identical. *Bieros v. Nicola*, 857 F.Supp. 445, 446 (E.D. Pa. 1994).  Under that test, Plaintiffs must show:  (1) a substantial likelihood of prevailing on the merits;  (2)  irreparable harm absent an injunction;  (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party;  and,  (4)  issuance of the injunction is in the public interest.  *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999).

### B.  Review of Agency Action under The Administrative Procedure Act

Neither NEPA nor the Department of Transportation Act provide an independent cause of action and therefore this case falls under the aegis of the Administrative Procedure Act.  Under the APA, the Tenth Circuit (as well as the D.C. Circuit[3]) directs that a court may set aside the Federal Highway Administration's ("FHWA's") decision to implement a highway project only if the Court finds the agency has abused its discretion, or has acted arbitrarily, capriciously, or contrary to the law. *See Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)(*citations omitted*).

The Court's role in reviewing the agency's decision is not to determine whether it was correct; rather the Court is limited to determining whether the agency's decision was in compliance with the law.  *See Associations Working for Aurora's Residential Environment ("AWARE") v. Colorado Dept. of Transp.*, 153 F.3d 1122, 1127 (10th Cir. 1998).

---

[3]  *See City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 269 (D.C. Cir. 2002).

### C.  Review/Analysis of NEPA Claims

NEPA requires that agencies such as FHWA evaluate the impacts of projects they propose prior to deciding to follow any specific course of action.  *Citizens' Committee to Save Our Canyons v. U.S. Forest Service*, 297 F.3d 1012, 1022 (10th Cir. 2002).  In discharging its duties under NEPA, the agency must take a "hard look" at environmental consequences of proposed actions.  This "hard look" at potential environmental impacts is accomplished through the environmental impact statement process.  *Id*.  NEPA does not mandate substantive results or permit the Court to substitute its judgment for that of the agency.  *Id*.  Rather, the Court must apply a deferential stand when reviewing the Agency's actions, reversing only if its actions are "arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence."  *Hoyl v. Babbitt*, 129 F.3d 1377, 1382 (10th Cir. 1997).

### III.  Section 4(f) Claim

As noted above, Plaintiffs alleged a violation of Section 4(f) of the Department of Transportation Act.  Section 4(f), 23 U.S.C. § 138,  provides in relevant part, that the Secretary shall not approve any program or project requiring the use of publicly owned  land from  an historic site of national, state, or local significance, as so determined by officials, unless (1) there is no prudent and feasible alternative to using that land; and  (2)  the program or project includes all possible planning to minimize harm to the historic site resulting from the use.

The regulations for Section 4(f) provide in part that "[a]ny use of lands from a section 4(f) property shall be evaluated early in the development of the action when alternatives to the proposed action are under study."  23 C.F.R. §771.135(b).

In instances where the Agency determines and the State Historic Preservation Officer ("SHPO") concurs that the project will not involve a use of any § 4(f) protected properties, the agency's duties with respect to the statute are concluded.  In cases where the SHPO and the FHWA agree that there will be no "use", it is not necessary to request an eligibility determination from the Keeper of the National Register.  *See* 36 C.F.R. § 800.4(c)(2).

In a nutshell, Plaintiffs' § 4(f) claim challenges the FHWA's finding in its record of decision ("ROD") that no land from any § 4(f) protected historic properties would be used as a result of the Project.  Plaintiffs disagree with this finding, and urge that in fact protected historic properties will be affected.  They contend that Defendants made an inadequate effort to identify historic properties and that the area of potential effect ("APE") as designated, was inadequate.  Plaintiffs argue that, because the Agency made an improper conclusion as to the use of the historic properties, it never reached the topic of an appropriate alternative under § 4(f).  Accordingly, the Agency failed to conclude that an enhanced two-lane alternative should have been selected because it would minimize harm to § 4(f) protected historic properties.

Defendants argue that they followed proper procedures[4] and appropriately analyzed potential 4(f) sites in the area, thereby correctly concluding in the ROD that the Project does not involve the "use" of protected historic sites.  Further, based upon their conclusion that the project will not "use" any historic properties, they argue that § 4(f) does not apply.  Finally, they contend  the conclusion that no formal Section 4(f) statement need be prepared was not arbitrary, capricious, or an abuse of discretion, nor otherwise contrary to law.

---

[4]  Defendants' description of their efforts in  conducting the Section 4(f) analysis of the Project are outlined on pp. 8-14 of Defendants' Opposition to Plaintiffs' Application for Temporary Restraining Order and Motion for Preliminary Injunction (Docket No. 8).

6

The Tenth Circuit applies the three-step analysis set forth in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). *See AWARE,* 153 F.3d at 1131. Accordingly, I will assess the Agency's actions and § 4(f) decisions under this three-step test. First, I must assess whether the Secretary acted within the scope of his authority. *Overton Park* at 415. The Secretary may only approve a transportation project that makes use of a § 4(f) property if "there is no prudent and feasible alternative to using the land ...." *Id*. at 411. In this context, ordinarily the Court would determine whether the Secretary properly interpreted his authority to approve use of a § 4(f) property in a federal highway project. In this case however, the Secretary concluded that there would be no use of any § 4(f) property, and therefore the first prong of review under *Overton Park* is inapplicable. *See Hatmaker v. Georgia Dept. of Transp*., 973 F.Supp. 1058, 1062-63 (M.D. Ga. 1997). Next, I must determine whether or not the actual choice made was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Overton Park* at 416. To make this finding, the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The Court is not empowered to substitute its judgment for that of the agency. Finally, I must determine whether the Secretary's action followed necessary procedural requirements. *Id*. at 417.

### A.  Background

In order to evaluate the Agency's action under *Overton Park*, the Court must carefully review the Agency's process of evaluation and decisionmaking.[5]

On May 4, 2001, the FHWA issued a Draft Environmental Impact Statement ("DEIS")(Defts'

---

[5] Judge Walton's Memorandum Opinion and Order contains extensive background information. Rather than re-state all such factual material, this Court will specify only the facts that are essential to its analysis contained herein.

Ex. 1).[6]  It included cultural resource information on buildings affected by the Project, among other things.  *See* DEIS at 3-44 to 3-51.  The DEIS contained a cursory identification of affected historic properties and archaeological sites, but stated that a final determination of the effect of the proposed Project on cultural resources and measures to mitigate unavoidable impacts would be made by the SHPO, in consultation with others.  DEIS at 3-49.  The DEIS indicated that "[F]inal determination will be a part of the final EIS."  *Id.*

The DEIS indicated that field surveys had been conducted to identify cultural resources, including historic buildings.  DEIS at 3-47.  "Complete information on the investigations can be found in the report, *Cultural Resource Survey of the US 70 Corridor between Ruidoso Downs and Riverside, Lincoln County, New Mexico*, Parsons Brinckerhoff Archaeology Group Report No. 148." *Id*.

On October 31, 2001, the FHWA forwarded the cultural resource survey[7] to the SHPO  for review and comment.  The Agency's forwarding letter[8] indicated that the APE for historic properties is variable throughout the Project.  Page 5 of the letter discussed the APE and stated that at a minimum it consists of the area within the construction slope limits.  "In addition, several properties outside the construction limits were identified, recorded, and evaluated for potential visual (secondary) impacts resulting from the proposed project.  These resources were identified in

---

[6]  As were the subsequent environmental impact statements and the ROD, the DEIS was based in part on information received in community and Agency meetings, as well as field investigations.  Each of the environmental impact statements summarized and were partially based upon previous studies and environmental impact statements.

[7]  Defts' Ex. 6.

[8]  This letter is contained in Appendix B-2, attached to the Final Environmental Impact Statement ("FEIS"), Defts' Ex.3.

consultation with Historic Preservation Division staff during a field visit on July 10-11, 2001." *Id.*

  This letter also indicated that there are 49 historic buildings within or adjacent to the Project. The letter categorized these buildings, largely concluding that: they were previously determined not eligible to the National Register of Historic Places ("NRHP"); they are not old enough to be considered historic; they lack distinctive characteristics; they lack integrity due to extensive remodeling or deteriorating condition; or, their historically important characteristics will not be altered by the Project. In summary, this portion of the letter indicated that only 13 historic buildings would actually be eligible for inclusion in the NRHP, but that the Project would have no effect on these buildings. Letter at 6. These 13 buildings were identified as: 37, 49, 104, 116, 119, 129A, 143, Features 1, 5, 7, 8, 11 and 12 at LA 129754.

  On November 15, 2001, the New Mexico SHPO reviewed and commented on the cultural resource survey in a letter.[9]   The SHPO indicated that his letter "serves only as comment on the findings of the Cultural Resources Report". Further, he indicated that the Historic Preservation Division concurs generally with the report's determinations of NRHP eligibility and effect, "but has determined a number of resources to be eligible and believes there are areas that require further investigation before a final determination of eligibility and effect is made." On page 3 of this letter, he indicated that with the exception of Building 116, neither of the build alternatives would affect individual buildings, nor potential historic districts identified as eligible for the NRHP. He indicated that a shifting of the alignment to the north would remove the adverse effect to Building 116's eligibility. The letter indicated a lack of information as to an unnamed cemetery (identified as Building 131) and about the Rio Hondo acequia system. The SHPO requested additional

---

[9] This letter is also contained in Appendix B-2 to the FEIS.

information on these two resources, in order to facilitate his determination of whether or not the Project would cause an adverse effect to their eligibility for listing on the NRHP.

Also on November 15, 2001, the FHWA issued a Supplemental Draft Environmental Impact Statement ("SDEIS"), Defts' Ex. 2. In the section that describes existing conditions (Sec. 3.2), the SDEIS discussed various buildings insofar as their eligibility in the NRHP is concerned. It concluded that eleven buildings are eligible for inclusion under the NRHP and that these buildings are in the APE. (See SDEIS at 18, Table 4-B).

The SDEIS discussed historic districts. SDEIS at 19. It noted that two potential historic districts were identified, but that the field survey was restricted to the portion of the properties within the right-of-way or the 150 foot corridor, whichever was greater, resulting in a small survey area. SDEIS at p. 19. It noted that the Tinnie District may be eligible, and that a portion of LA 129574 is eligible.

Finally, the SDEIS discusses rural historic landscapes. As with the historic districts, the field survey was restricted. The SDEIS concluded that the Coe Ranch property may be eligible for inclusion in the NRHP. SDEIS at 21. The SDEIS concluded that the entire Hondo Valley as an agricultural landscape does not fit any of the National Register criteria of significance, nor has it maintained sufficient historical integrity. SDEIS at 21.

Section 3.2.2 of the SDEIS discusses the impacts to cultural resources that will be caused by the Project. It limited its assessment of impacts to those resources that have been determined eligible for inclusion in the National Register. SDEIS at 22. The SDEIS concluded that none of the eleven buildings determined eligible to the NRHP, as well as the Picacho Cemetery[10], would be affected by

---

[10]  This was previously identified as Building 131.

10

the Project.  SDEIS at  22.  "The project will not alter, either directly or indirectly, the characteristics

of these properties that make them historically important."  SDEIS at  22.  It likewise concluded that

neither of the potential historic districts would be affected by the Project.  Finally, it concluded that

the  Project would not affect the qualities that make the Coe Ranch historically important.  It reserved

evaluation of any additional rural historic landscapes until a later time, prior to completion of the final

EIS.

Later in the SDEIS, Section 4(f) is discussed.  Even though the properties above-delineated

were found to have potential historic significance, the Agency determined that none of these

properties would be affected by or "used"  in this Project.  SDEIS at  24 - 28.  On this basis, the

Agency concluded that Section 4(f) was not implicated.  In some detail, the SDEIS explained  its

earlier conclusion on page 22, that there would be no effect on any of these buildings, historic

districts, rural historic landscapes, the Picacho Cemetery or the Rio Hondo Acequia.[11]

The SDEIS addressed the issue of the APE.[12]  It indicated that the APE differs throughout

the corridor depending on the type of resource and the nature of potential effect and that, for each

type of resource, it was developed in consultation with the State Historic Preservation Officer.

SDEIS at  14.  The SDEIS further indicated that "all cultural resources within the APES were

recorded and evaluated for eligibility to the National Register of Historic Places (National Register,

or NRHP)."  SDEIS at  14.

----

[11]  As to the Rio Hondo Acequia, the SDEIS concluded that there are no historically important features
associated with the ditch segments within the proposed project limits.  Further it stated that the general appearance
of the system will be protected and that none of the qualities that make the system historically important will be
changed substantially.

[12]  The SDEIS defines this as the "geographical area in which effects of a project, both direct and indirect,
could take place."  SDEIS at 14.

The FHWA issued the Final Environmental Impact Statement ("FEIS") on January 29, 2002. The FEIS noted that the SHPO had determined that impacts to the Rio Hondo acequia system would not affect its historic significance or integrity.  FEIS at 1-12.  The FEIS noted that, as a condition of the SHPO's concurrence with the cultural resource survey, the NMSHTD was asked to identify and evaluate other potential cultural landscapes adjacent to US 70.  FEIS at  1-12.  The FEIS indicated that the results of these investigations are presented in Addendum 2,[13] as summarized in the FEIS. *Id*.  These additional investigations determined that (1) the sites are outside the area of potential effect and therefore will not be affected by the Project; and/or (2)  the historical integrity of the sites has not been retained due to substantial modifications, and therefore these sites are likely not eligible for inclusion in the National Register.  FEIS at  1-12.  The FEIS provided information as to mitigation of effect on Building 116 and Building 131.  Specifically, it indicated that both  buildings would be avoided by shifting the roadway alignment to the north.  The FEIS indicated that all actions required by the SHPO would be addressed prior to the issuance of the ROD.  FEIS at  1-13.

The FEIS concluded that neither of the two build alternatives would utilize 4(f) protected historic properties.  FEIS  at 5-2.   The FEIS states that the SHPO has concurred with FHWA's finding that a use of historic resources protected by Section 4(f) will not occur.  FEIS p. 5-2.[14]

Attached to the ROD is a January 30, 2002 letter from the FHWA to the SHPO.  This letter forwarded a Addendum 2[15] that was prepared in response to the SHPO's request for additional

---

[13]  Addendum 2 is Defendants' Exhibit 8.

[14]  The Court notes that in fact the SHPO's November 15, 2001 letter did not include such an unconditional concurrence, but in fact requested further information.

[15]  This document, Defendants' Exhibit 8, was  prepared by Parsons Brinckerhoff and is dated January 2002.  It is entitled: *Addendum 2:  Additional Survey of the  US 70 Corridor Between Ruidoso Downs and Riverside, Lincoln County, New Mexico.*   The additional information in the addendum  included avoidance

information in his November 15, 2001 letter.  Also on November 15, 2002, the FHWA wrote to the

SHPO, indicating that the Project would have no effect on the potentially eligible historic district at

Tinnie.

On March 15, 2002, the FHWA issued its ROD, selecting Alternative 3, the continuous four-

lane highway alternative,  because of its "greater safety benefits."  ROD at 1.  The ROD indicated that

the  additional  investigations  requested  by  the  SHPO  had  been  completed,  and  that  the  SHPO

concurred with the "no effect" determination as to the eligible cultural resources examined during

additional investigations.  ROD at 3.  "These additional investigations were completed and SHPO

concurrence with the "no effect" determination to the eligible cultural resources examined during the

additional investigations was received on February 21, 2002."  ROD at 3. The ROD indicated that

the selected alternative does not constitute a use of any historic property, nor does it involve a use

of Section 4(f) properties.  ROD at 3.

In  response  to  comments  from  the  National  Trust  for  Historic  Preservation,  the  ROD

discussed the topic of whether or not the APE is too restricted.  ROD at 6.  In addition to what was

stated in prior environmental impact statements, it elaborated on how the variable  distance was set,

and specifically mentioned the July 10-11, 2001 field inspection.

> During this field inspection the visibility of the current roadway from properties below the
> highway profile was assessed, and if the current roadway was not visible from the property,
> then the APE was reduced to 150 ft. from the edge of pavement.  The APE also was set  by
> examination of construction plans to examine the locations of cultural resources in relation
> to the construction slope limits.  These study units were proportional to the scale of potential
> impacts from the project, and the SHPO concurred with the APE (SHPO Log No. 63548).
> The APE was set in accordance with 36 CFR  800.4.

---

measures for Building 116; assessment of project effect on Building 131; total linear feet of eligible ditch system
affected by the proposed  Project; and, additional survey and archival research of potential cultural landscapes in
the vicinity of the US 70 corridor.

ROD at 6-7.

Furthermore, the ROD stated that the FHWA would develop a "programmatic agreement . . . with groups interested in being a consulting party for Section 106 consultation", but that this consultation was limited to "determinations of effect on previously unidentified cultural resources and potential impacts to identified resources that are affected by design changes and construction activities."  ROD at 7 and 16.  It indicated that the FHWA will be the federal lead agency for development of the programmatic agreement  under the current regulations as per 36 CFR § 800. ROD at 16.

The programmatic agreement ("PA") was executed in July 2002.  *See*  Defts' Ex. 13.  It indicates that the APE for the Project, as defined in 36 CFR § 800.16(d), includes basically those properties within 150 feet of the edge of pavement on either side of the existing roadway, but with a variable-width APE for historic properties where a potential visual effect was considered from what was known of the potential impacts of the conceptual design.  Appendix A to the PA indicates those areas where the APE went beyond the 150 foot limit.   The PA indicates that the APE may be altered to include the  historic properties listed in Appendix F as the implications of the roadway design become more apparent.  PA at 1. Further, the PA noted these properties are located outside the APE and were not fully evaluated for the National Register eligibility, but that they would be evaluated if future refinements to the road design indicate that any of these properties may be affected.  PA at 2. The PA indicated that, pursuant to 36 CFR § 800.13, the Defendants, SHPO and others have developed procedures in the PA to ensure the identification and evaluation  of historic properties, as well as assessment of effects and development of treatment and mitigation plans for unforeseen effects to previously unidentified historic properties and/or historic properties discovered during

14

implementation of the undertaking, to ensure that they are properly coordinated with all phases of the design and construction of the Project.  PA at 3.  The PA created a Cultural Resources Task Force. PA at  4.  The PA states that FHWA will ensure that avoidance of adverse effects to any previously identified historic properties is the preferred alternative and will utilize all feasible, prudent and practicable measures to avoid adverse effects.  If avoidance is not possible and an adverse effect will result, the PA indicated that the FHWA will develop a mitigation plan and submit the evaluation and mitigation plan to the SHPO for review and concurrence.  PA at 7.

### B. Analysis of Section 4(f) Claims

Plaintiffs first contend that the Agency violated §4(f) by issuing a ROD that concluded this Project would not "use" land from any  §4(f) protected properties, without undertaking adequate efforts to identify historic properties that would be affected by the Project.

I have combed this record and conclude that the Agency carefully delineated certain properties, including specific buildings, features, historic districts and landscapes that could be eligible for listing on the National Register.   As outlined above, extensive efforts and coordination with the SHPO were undertaken to identify potential § 4(f) properties.   Consideration of the factors for eligibility, as contained in 36 C.F.R. § 60.4, is clearly reflected in the correspondence to and from the SHPO. I conclude that appropriate factors, relevant to these determinations, were considered.

One specific instance of complaint is Plaintiffs' contention that the Agency failed to adequately evaluate the historic significance of the Hondo Valley in its entirety as a single, unified cultural landscape.  As noted above, the SDEIS stated that the entire valley as an agricultural landscape did not fit any National Register criteria of significance, and that it had not maintained sufficient historical integrity.  SDEIS at 21. I note that the SHPO never raised the entire valley as a

15

potentially eligible landscape.  The Court is left with the implication that, if the SHPO had considered the entire valley to be appropriately considered as an eligible landscape, he would have raised the issue, as he did so many others.  I am satisfied that this omission by the SHPO answers the concern raised by Plaintiffs that there is not a specific concurrence by the SHPO as to the conclusion in the SDEIS about the entire valley.

   In addition to eligibility determinations, as explained more fully in the APE discussion below, the Agency made extensive efforts in its determination as to the potential "use" of each site, considering factors such as visual impacts, following several field studies.  I have carefully tracked the correspondence and conclude that the SHPO and the Agency were in agreement on this issue.  As concluded in the ROD, the Project as then configured, would not "use" any § 4(f) property.

   I am unable to say that the decisions regarding the identification of potential § 4(f) properties, or the determination of  "no use" were erroneous, or that  these decisions were arbitrary, capricious, or an abuse of discretion.  I believe that the Agency's determinations took into account the relevant factors set forth in the applicable regulations.

   Furthermore, as noted above, I have carefully followed the steps taken and conclude that the Agency's action followed necessary procedural requirements. Significantly, the cultural survey report and its supplement also reflect the extensive work done in this area of investigation and analysis of potential eligibility and use.  Final concurrence was received from the SHPO regarding eligibility for National Register listing and effects, thus concluding the eligibility determination process.

   Underlying their overall § 4(f) argument is Plaintiffs' specific argument that FHWA failed to make any efforts to identify the presence of historic properties that were located more than 150 feet away from the edge of the current roadway.  Plaintiffs argue that the Agency's determination of an

APE of basically 150 feet was arbitrary and operated to foreclose appropriate recognition of impacts to § 4(f) protected properties.

What the record reflects is that the APE was variable, depending on that type of resource and the nature of potential effect, and that for each type of resource, it was developed in consultation with the SHPO.  SDEIS at 14.  As explained on page 6 of the ROD, the APE was determined in part, based on visibility of the current roadway from historic properties.  According to this same explanation, the APE was set in accordance with 36 CFR § 800.4.  The PA noted that buildings listed in Appendix F are located outside the APE and were not fully evaluated for National Register eligibility, but that they would be evaluated if future refinements to the road design indicate that any of these properties may be affected.  PA at 2.

I am unable to conclude that the designated APEs are  inadequate or that they were arbitrarily determined.  Rather I conclude that these variable APEs were based on a consideration of the relevant factors and that there has not been a clear error of judgment. I will not substitute my judgment for that of the Agency.    Further, I have carefully considered the Agency's procedures taken to reach these determinations, such as the field studies and evaluations for visible effects, and conclude that the Agency took adequate and appropriate steps to reach the conclusions that it did.        T h i s conclusion is not changed by the fact that other properties may be evaluated for National Register eligibility if future changes to the road design so necessitate.  Contrary to Plaintiffs' arguments, this reservation of further evaluation does not render this case similar to the case of *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. 1999).  In that case, the Court held that FHWA violated § 4(f) in part because it deferred all investigations of historic sites until after the issuance of the ROD.  Specifically, that programmatic agreement required the FHWA to identify the historic

properties in each of 14 segments, to assess the project's impact on the properties, and to utilize all feasible, prudent and practicable measures to avoid adverse effects to them. The *Corridor H* Court concluded that the agencies failed to make even the preliminary pre-ROD 4(f) determination that 23 C.F.R. § 771.135(o) requires. In contrast, in this case, the identification of cultural resources within the APE and evaluation of the effect on each identified resource was conducted throughout the pre-ROD process, as indicated above.

This situation is also dissimilar from another case relied upon by Plaintiffs, *Utahns for Better Transportation v. U.S. Dept. of Transp.*, 305 F.3d 1152 (10th Cir. 2002). In that case, the Tenth Circuit held that the wildlife impact analysis in an FEIS was inadequate, because the Agency considered the impacts within an arbitrary 1,000 foot distance from the right-of-way. The Court noted that the record clearly indicated that this 1,000 foot limit did no allow for consideration of impacts on migratory birds. As I've already stated, the APEs set in this Project were not arbitrarily set, but were done so after field study and the consideration of potential visual effect. I find nothing in the record to support Plaintiffs' argument that Defendants focused mostly on the buildings themselves and did not consider natural and topographic features that are part of an historic site. For the reasons stated above, I am unable to find the § 4(f) procedures and determinations inadequate.

This case is however similar to the case of *City of Alexandria, Va. v. Slater*, 198 F.3d 862 (D.C. Cir. 1999). In that case, the Agency postponed identification of sites where it would conduct construction-related activities. The Court noted that all that was deferred was identification of sites that might be impacted by a small number of ancillary activities, which was quite distinguishable from the programmatic agreement it had proscribed in *Corridor H*. Here, the Agency has simply indicated that a future refinement in road design may necessitate evaluation of the resources listed in Appendix

F to the PA.  As in the *City of Alexandria* case, such an approach does not violate § 4(f), given that the Agency has done extensive investigation and evaluation of properties it believes will be in the APE of the current design.

## C.  Section 4(f) Conclusion

I conclude that the Agency made the proper inquiries into the factors that determine a site's eligibility for listing and further made reasonable conclusions about the potential for use of those sites that were deemed eligible.  Further, I conclude that the Agency met its  procedural requirements in reaching its eligibility and use conclusions.  Accordingly, I conclude that Plaintiffs are unlikely to succeed on the merits of their § 4(f) claims.   It is my opinion that the FHWA has complied fully with § 4(f).  Because I am unable to conclude that the Agency made an improper conclusion as to the use of historic properties, I do not reach the Plaintiffs' argument that the Agency erred by not selecting the enhanced two-lane alternative, on the basis that it would minimize harm to § 4(f) protected properties.  Plaintiffs' motion for preliminary injunction is **denied** on their § 4(f) claim.

## IV.  Conflict of Interest

Plaintiffs contend that the environmental impact statement process should be invalidated based upon an alleged conflict of interest of the engineering contractor, Parsons Brinckerhoff ("PB").   PB prepared the NEPA documents and also had a contract to provide administrative management services in connection with the final design and construction of the highway project.  Defendants do not dispute that PB had an enforceable contract to provide "Phase III" contract management services

for the approved project at the same time[16] it was under contract to prepare the NEPA and cultural resource studies.

A contractor with "an agreement, enforceable promise or guarantee of future work" has a conflict of interest under 40 C.F.R. §1506.5(c). *AWARE,* 153 F.3d at 1128. In *AWARE,* the Tenth Circuit concluded that a sufficient degree of oversight exercised by Defendants could be sufficient to cure any conflict of interest, obviating the need to invalidate the environmental impact statement ("EIS"). *Id.* According to the *AWARE* case, this Court should "evaluate the oversight that the agency provided to the environmental impact statement process as a factual matter and make a determination" regarding whether or not to uphold the environmental impact statement. *AWARE* at 1129. When reviewing an EIS prepared by a contractor who has allegedly breached a requirement imposed by 40 C.F.R. § 1506.5(c), the ultimate question for the court is thus whether the alleged breach compromised the objectivity and integrity of the NEPA process. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 202 (D.C. Cir. 1991).

In evaluating the degree of oversight exercised by the Agency in the preparation of the EIS, Judge Walton relied on the September 12, 2002 Declaration of Gregory D. Rawlings, characterizing it as uncontroverted evidence that Defendants provided the requisite oversight of the contractor's preparation of the reports involved in this matter. Judge Walton indicated that although Plaintiffs "may later obtain evidence to refute the representations made in this declaration", they had failed to demonstrate a likelihood of success of their claim that Defendants had violated NEPA by utilizing an engineering firm with a conflict of interest.  Mem. Op. and Order at 32.

---

[16] PB was hired to serve in Phases I and II of the environmental evaluation for this Project.  On May 29, 2002, the FHWA approved the use of Federal-aid highway funds for the NMSHTD to procure PB to serve as management and Phase III environmental consultants on this Project.

Rather than rely on the Rawling's Declaration, as already noted, I have carefully combed the records that were submitted in connection with the motion for preliminary injunction.[17]  At the time of the November 20, 2002 hearing on this motion, the entire administrative record had not been filed with the Court.  At that time, I requested Defendants to submit whatever documents existed in the administrative record that were not yet before the Court, that were relevant to the oversight issue. Defendants have submitted 21 such documents as well as the contracts between NMSHTD and PB. (*See* Defendants' Post-Hearing Submission of Information Regarding Agency Oversight of Parsons-Brinckerhoff, Docket No. 18).

In reviewing all documents relevant to this issue, I note the extensive involvement of both state and federal  officials in oversight activities.  Both agencies reviewed, approved and submitted all environmental impact statements.  Chapter 5 of the DEIS outlines agency coordination and public involvement.  This statement, as do subsequent environmental impact statements, reflects direct involvement of the state and federal agencies in the process.  For example, the Introduction to the SDEIS specifies the involvement of NMSHTD in collecting additional information and completing additional analyses, following public hearings. It mentions the state agency's response to public comments, in refining alternatives under consideration and completing supplemental investigations. State agency involvement in community meetings is mentioned throughout the process.  The SDEIS specifically mentions that on October 23, 2001, representatives from both the state and federal agency met  with  representatives  of  the  Valley  Community  Preservation  Commission.   SDEIS at 4. Consultations with other agencies and citizens groups were conducted by one or both agencies at

---

[17]  I am well aware that the factual basis for my decisions on all of Plaintiffs' claims must be found in the administrative record itself and that administrative agencies may not rely on "*post hoc* rationalizations" to justify their decisions.  *Utahns for Better Transportation,* 305 F.3d at 1165.

every step of the environmental process.  As already noted herein, considerable review and participation by the New Mexico SHPO occurred.  The documents recently submitted by Defendants especially emphasize participation in the process by FHWA personnel.

Plaintiffs argue that the type of review outlined by Defendants in their Exhibit 12 do not suffice for the review contemplated by 23 U.S.C. § 112(g).[18]  They argue that there is no evidence that the NMSHTD undertook the required review to assess the objectivity of the EIS prior to its submission to the FHWA.

I disagree with this conclusion.  As indicated by the actions above-mentioned, NMSHTD's involvement in the process leading up to the FEIS and its conclusions are apparent from the various underlying environmental impact statements.  It is obvious that both the federal and state agencies participated in various meetings with the public and with government officials, in preparation of the Supplemental Draft Environmental Impact Statement ("SDEIS") and of the Final Environmental Impact Statement, in consultations with the State Historic Preservation Officer (SHPO), and that they provided  responses to questions from many organizations and individuals.

For the reasons stated above, I conclude that the Defendants exercised a sufficient degree of supervision and oversight to cure any conflict of interest and that the environmental impact statement need not be invalidated.  I am unable to conclude that the objectivity and integrity of the NEPA process has been compromised by this conflict.  I am convinced that the degree of supervision exercised by both agencies protected the integrity and objectivity of the FEIS in this case.

---

[18]  This section  states that a State may procure, under a single contract, "the services of a consultant to prepare any environmental impact assessments or analyses required for a project, including environmental impact statements, as well as subsequent engineering and design work on the project *if the State conducts a review that assesses the objectivity* of the environmental assessment, environmental analysis, or environmental impact statement prior to its submission to the Secretary."

Based upon the evidence in the record, the Court cannot conclude that Plaintiffs have demonstrated a substantial likelihood of success on the merits of this NEPA claim, and thus their request for a preliminary injunction must be **denied**.

### V.  Issue of Injunction Pending Appeal

The decision contained herein is immediately appealable pursuant to 28 U.S.C. § 1292.  At the November 20, 2002 hearing, Plaintiffs' counsel orally moved the Court for an injunction pending appeal, should the Court deny the immediate motion.  This request could also be interpreted as a Motion for Stay under FED.R.APP.P. 8.

The Court, having determined that the none of the requirements for a preliminary injunction has been met by Plaintiffs, concludes that there is no basis to enjoin the highway project that is the subject of this litigation, and therefore there is no basis to stay the judgment of this Court pending appeal. Therefore, Plaintiff's oral motion must be **denied.**

### VI.  Conclusion

As stated at the outset of this Memorandum Opinion and Order, this Court has focused on the § 4(f) and oversight issues.  Judge Walton's opinion includes analysis of other issues, including a lengthy analysis of FHWA's compliance with regulations promulgated under § 106 of the National Historic Preservation Act.  Although Plaintiffs did not include a claim alleging violation of the NHHPA, Judge Walton opined that the Agency had complied with that statute.  *Id*. at 17-18, 23. While Judge Walton's decision is not technically incorrect, as noted by Defendants in their brief, it is not dispositive as to the § 4(f) claims raised in this motion.  Accordingly, this Court will allow

Judge Walton's opinion to remain in the record, and adopts its reasoning, but has found it necessary to supplement this reasoning, as stated herein.

Accordingly, for all the reasons stated in the record, in both Judge Walton's opinion and in this one, this Court concludes that Plaintiffs have not established that they are likely to succeed on the merits of their § 4(f) or NEPA claims and that they have met none of the requirements for a preliminary injunction.  Accordingly Plaintiffs' motion for preliminary injunction is hereby **denied.**

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**